1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATRESHA DAWSON**,<br><br>                   Plaintiff,<br>v.<br><br>**WILLIAM E. REUKAUF<br>ACTING SPECIAL COUNSEL**<br><br><br>                   Defendant. | **Civil Action No. 07-1354 (RJL)**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, through her counsel, alleges as follows:

## I.  NATURE OF THIS ACTION

1.      This is a mixed case employment discrimination action by an African-American woman based upon the Defendant's removal of her from the federal service because of her protected disclosures under the Whistleblower Protection Act, 5 U.S.C.A. § 2302.  This is also an action to redress the discriminatory and retaliatory removal of the Plaintiff, as well as discriminatory and retaliatory actions against the Plaintiff prior to her removal  because of her race, gender and sexual harassment in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), because of her disabilities under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, and because of her opposing and complaining about race, gender, and disability discrimination pursuant to the anti-retaliation provisions of Title VII, 42 U.S.C. § 2000e-3(a), and of the Rehabilitation Act, 29 U.S.C. § 791.

AMENDED COMPLAINT- 1

## II. PARTIES,

2.      Plaintiff is a citizen of the United States and a resident of the state of Maryland.

3.      The Defendant is the Acting Special Counsel at the U.S. Office of Special Counsel.  The Office of Special Counsel was established on January 1, 1979, by Reorganization Plan Number 2 of 1978, 5 U.S.C.A. App.1, § 204. The Civil Service Reform Act (CSRA) of 1978, effective on January 11, 1979, enlarged its functions and powers. Pub. L.  No. 95-454, 92 Stat. 1111 (1978).  In March of 1989, Congress enacted the Whistleblower Protection Act, Pub. L. No. 101-12, 103 Stat. 16, which established the Office of the Special Counsel as an independent agency within the  Executive Branch, separate from the Merit System Protection Board, and renamed it the United States Office of Special  Counsel (OSC).  The Defendant  is by statute the appropriate and only person to be named as a defendant herein as to all claims.

### III.        JURISDICTION, VENUE, AND EXHAUSTION.

4.      Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 on the basis that the claims for relief in this complaint present substantial federal questions.  Jurisdiction is also conferred by 5 U.S.C. §§ 7701 and 7702, 42 U.S.C. § 2000e-5(f)(3), and 29 C.F.R. § 1614.302 (a)(2).

5.      Venue lies in this United States District Court under 28 U.S.C. § 1991(b) and (c) by virtue of the fact that the Defendant is regularly engaged in business in this judicial district, the U.S. Office of Special Counsel is located herein, and the conduct complained of herein occurred and/or resulted in injury to the Plaintiff in this judicial district.

6.      Plaintiff has exhausted all administrative procedures required by law on all of the claims for relief pleaded herein. As to the discriminatory and retaliatory removal on the basis of Plaintiff's sex/gender,  hostile working environment, disability, and protected disclosures under 5 U.S.C. § 2302,  she filed a formal complaint of discrimination on February 2, 2007, and the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Office of Special Counsel issued a Final Agency Decision dated June 21, 2007.  This action was originally filed within the prescribed 30 days from Plaintiff's receipt by certified mail of said decision.  As to discrimination and retaliation prior to Plaintiff's removal on the basis of sex/gender, disability, sexual harassment, hostile working environment,  and reprisal for her prior EEO activity, she filed a formal complaint of discrimination on April 6, 2006, and the Office of Special Counsel issued a Final Agency Decision dated May 2, 2007.  This action was originally filed within the prescribed 90 days from Plaintiff's receipt by certified mail of said decision.

## IV.     GENERAL FACTS

7.     Plaintiff Natresha Dawson was a GS-0950-09 Paralegal Specialist, assigned to the new Customer Service Unit, United States Office of Special Counsel (OSC) at the time of her removal on November 17, 2007.

8.     At the time of her hiring by the OSC on June 25, 2005 until November 17, 2007, Plaintiff had worked in the federal government for 17 years.  Prior to assuming her position at OSC, Plaintiff served as the legal secretary for the Chief Administrative Law Judge (ALJ) at the U.S. Department of Agriculture.  During Plaintiff's 17 years of public service, she completed her undergraduate studies and earned an AS and BS in Legal Studies.  Additionally, she had consistent, good performance ratings including her last performance rating of record, an "Outstanding" with the Chief Administrative Law Judge.

9.     Plaintiff accepted her position at OSC on the condition that she would be promoted into her next level upon reaching her time-in-grade and her exiting and receiving agencies prepared official personnel actions to reflect such.   However, after Plaintiff made several internal protected disclosures, management reneged on and denied the career-ladder promotion and perpetrated other retaliatory acts.  For example, on October 2, 2005, Plaintiff initiated an EEO complaint and approximately three weeks after filing the EEO complaint she

AMENDED COMPLAINT- 3

was downgraded from the GS-9/11 to the GS-9 without being given an official desk audit or evaluation.  Approximately, six months later, Plaintiff learned through an agency-wide email that OSC had enforced corrective actions awarding career-ladder promotions to three male employees on the same basis she was denied.  Plaintiff raised her concern about the agency's practice of awarding career-ladder promotions with her immediate and second line supervisors and when she again requested that she receive the promised career-ladder promotion her request was denied without proper justification.

10.     Until taking extended medical leave in April 2006, Plaintiff was one of two Paralegal Specialists initially hired for the OSC's new Customer Service Unit (CSU) that the Defendant specifically created to address criticisms and honor commitments for improvement of the OSC that he made at a May 2005 Senate Governmental Affairs Committee oversight hearing.

11.     Initially only one other CSU staffer and Plaintiff worked with the Complaints Examining Unit (CEU).  In August 2005, the CSU was moved to become part of the Human Resources branch led by Mr. Robert Wise, Director of Human Resources and Plaintiff's immediate supervisor.  Mr. Wise instructed Plaintiff to limit herself to receiving phone calls from federal employees alleging Prohibited Personnel Practices and merely summarizing for callers the information that was on the OSC website.

12.     As set forth below, following her protected disclosures and the filing of EEO, MSPB, Prohibited Personnel Practices and whistleblower complaints, Plaintiff was continuously harassed and subjected to a hostile work environment of such a severity that she suffered and subsequently was diagnosed with "acute stress" by her medical doctor in February 2006.  On or about March 28, 2006, Plaintiff was separately diagnosed as being "incapable of performing her duties due to illness" by her health care professional, Susan White, on March 28, 2006.

AMENDED COMPLAINT- 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13.     Subsequent to taking approved medical leave, Plaintiff filed an EEO complaint, Office of Workers' Compensation Claim, Federal Tort claim and whistleblower complaints with the OSC and Merit System Protection Board, and continued her protected disclosures, which included providing testimony to Congressional committees and disclosing to senior management that she was being harassed and subjected to a hostile work environment.  After approving both her paid and unpaid leave, and her entitlement to Workers' Compensation benefits, the OSC removed Plaintiff from Federal service on November 17, 2006, allegedly because the Plaintiff was "Absent without Leave" (AWOL).

## V. FACTS REGARDING SPECIFIC PROTECTED ACTIVITIES

14.     Prior to taking her medical leave beginning in February 2006,  Plaintiff made successive disclosures to her supervisors and the Defendant that OSC was grossly failing to achieve its core statutory mission of investigating whistleblower complaints, and determining the facts and necessary action to redress Prohibited Personnel Practices against whistleblowers seeking OSC assistance.

15.     Plaintiff disclosed that OSC personnel seldom questioned, discussed or took any action on the many calls from alleged victims of whistleblower retaliation.   The mission of the CSU was to expedite by telephone action on these whistleblower complaints, but Plaintiff observed that when CSU staff filed their intake reports, there was no follow up by the rest of the agency.  Intakes that did receive any attention were regularly dismissed arbitrarily, even though their alleged facts appeared to correspond directly to the elements of a valid claim of prohibited personnel practices.

AMENDED COMPLAINT- 5

16.    OSC supervisors and other staff regularly dismissed and denigrated whistleblowers as "crazy."  When Plaintiff protested that this attitude was inconsistent with the Agency's core mission, and explained that she was able to observe from her intakes that these whistleblowers were not "crazy", but were emotionally distressed because they were under attack, bewildered and in danger of losing their professional lives, her supervisors became distrustful of her. Plaintiff complained that the OSC exhibited no commitment to help whistleblowers, as for example when a CEU Team Leader threw a whistleblower's emergency stay request on a stack of other papers and refused to discuss it with Plaintiff when she attempted to have the stay requested reviewed.

17.    Plaintiff disclosed to Agency managers that the OSC was structurally and functionally isolating CSU staff from the Complaints Examining Unit, and that without establishing coordination or a working partnership between the units, the Special Counsel could not effectively know about much less redress reported prohibited personnel practices.

18.    Plaintiff disclosed that her supervisor's restriction of direct communication between the CSU and other OSC staff was severely reducing efficiency and exacerbating backlogs of resolving whistleblower reports of wrongdoing and retaliation against them.

19.    Plaintiff disclosed that even within the OSC, there was an atmosphere of fear and intimidation despite the agency's own Anti-Harassment policy, and that employees were chilled from reporting the OSC's failure to comply with OPM approved rules and procedures regarding the terms and conditions of employment.

20.    Plaintiff spoke with her immediate supervisor, Mr. Robert Wise, regarding the use of the term "crazy" as it was related to the complainants who called in with allegations of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Prohibited Personnel Practices (PPPs) and informed Mr. Wise that she believed the complainants were making sincere allegations.

21.     When Plaintiff approached her supervisor, Mr. Wise, and alleged that the OSC appeared to hire management staff, including a FOIA Specialist, almost all of whom were white, not based on merit selection principles, and that some positions appeared to be filled without postings or vacancy announcements, Mr. Wise's comments implied that the Plaintiff appeared to be looking for trouble.

### VI.     FACTS AS TO RACE, SEX/GENDER AND DISABILITY DISCRIMINATION, HOSTILE WORKING ENVIRONMENT AND RETALIATION FOR OPPOSING AND REPORTING IT.

22.     The OSC maintained a workplace of *de facto* segregation in office placement for OSC staff based on race. Initially, Plaintiff was assigned to an office located on the side of the building referred to as "Mahogany Row," but was later informed that she would need to be moved.   "Mahogany Row" was the informal reference used by OSC employees to describe the location of the nicer offices in the building.  Plaintiff heard from some senior Black employees that no Black employees were given offices on "Mahogany Row."  When Plaintiff asked why she could not continue her seating on that side of the building, she was told that her office was being reserved to store files and other offices on that side were being reserved for potential new hires of SES employees.  Other vacant offices were being reserved for old furnishings and new potential hires.  Although stating that some of the vacant offices on that side of the building were reserved for future SES employees, ultimately some of this vacant space was assigned to white interns and contractors.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

23.     Plaintiff was removed from her initially assigned office on "Mahogany Row" by Mr. Wise who told her that she was moving because the Associate Special Counsel Lenny Dribinsky complained that he could not walk by Plaintiff's door "without his stomach turning." Later Plaintiff was assigned to an office directly adjacent to the men's restroom, subjecting her to the offensive smells, bathroom traffic and noises.

24.     In October 2005, Plaintiff initiated EEO proceedings and approximately three weeks later, her immediate supervisor downgraded her position description from a GS-9/11 to a GS-9 without providing her with an official desk audit or performance evaluation but still required her to perform the duties of the higher-level position.

25.     In December 2005, Mr. Wise and another female staff member were speaking in front of Plaintiff's office loudly enough for Plaintiff to clearly hear the conversation.  During that conversation, Mr. Wise told the staff member a told story about his Venezuelan girlfriend, indicating that his girlfriend had been jealous when they were dancing at a nightclub. Mr. Wise stated that he had to comfort his girlfriend by engaging in various sexual acts that he described in detail.  Plaintiff was offended by this talk and asked them to move their conversation from in front of her office.

26.     In her previous position, Plaintiff was a timekeeper who had been trained by the National Finance Center (NFC).  Plaintiff called the NFC when she did not receive her first paycheck.  Mr. Wise verbally reprimanded Plaintiff for making the phone call.

27.     When Plaintiff contacted the OPM, Mr. Wise instructed her not to call the OPM again.  He stated that the Human Resource Specialists, including Caroline Heard, were responsible for calling the OPM.

AMENDED COMPLAINT- 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

28.     Mr. Wise then began instructing Plaintiff to change seating arrangements, which accumulated in five changes during the first two months of Plaintiff's employment with the OSC.  When Plaintiff informed Mr. Wise that a chair fell from furniture stacked around her seating area at least six feet high and almost struck her on the head, Mr. Wise then revoked Plaintiff's flexible working schedule.

29.     Plaintiff's second line supervisor then falsely accused her of illegally accounting for her time.  In response to this controversy, Plaintiff was directed by Mr. Wise to seek assistance from an Employee Assistance Program counselor.

30.     When Plaintiff questioned Mr. Wise about her working conditions, Mr. Wise accused Plaintiff of being on a secretive fact-finding mission.  When Plaintiff complied with the agency's own Anti-Harassment policy and contacted the Special Counsel regarding the working conditions, she was given a letter of counseling which had the effect of gagging the Plaintiff from making further disclosures to Mr. Bloch or filing further complaints.  The letter of counseling threatened among other statements that if Plaintiff contacted the Special Counsel again or made any further complaints, she would be disciplined, including and up to removal. To Plaintiff's knowledge no other OSC employee was instructed not to contact Mr. Bloch directly with whistleblower or other personnel concerns.

31.     In February 2006, Plaintiff's medical doctor ordered her to take time off of work due to acute stress.  As a result, Plaintiff initiated her first Office of Worker's Compensation (OWCP) claim and utilized the entitlement of Continuation of Pay (COP) for 45 days.  Plaintiff only used 12 of the 45 days because her medical doctor released her to return to work before the 45 days of COP were exhausted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32.     On March 8, 2006, Plaintiff returned to normal work duty, informed Mr. Wise of her medical situation and asked that her leave records be corrected to accurately reflect her leave status, and to show that she was back on regular work duty and not COP.  Mr. Wise approved this request and had her records adjusted to reflect that she was back in normal work duty status and no longer in COP status.

33.     On March 9, 2006, Plaintiff was finishing up an EEO affidavit that she was required to file by 10:00 AM.  Mr. Wise came to her seating area and asked what was she doing and Plaintiff gave an accounting of her activities.  Mr. Wise said nothing but turned around and left.  Plaintiff completed the affidavit and turned it in to the agency's EEO investigator.

34.     Around 12:00 noon that same day, Mr. Wise instructed the security officer, Mr. Doug Stickler, to call the police on Plaintiff.  The police arrived in response to allegations of threats being made but after completing their investigation the police found the allegations to be unsubstantiated.

35.     On March 20, 2006, Plaintiff and Mr. Wise left the office of Human Resource Specialist Caroline Heard and Mr. Wise asked Plaintiff a question about her duties. Plaintiff answered Mr. Wise and started walking down the hallway towards her office.  Mr. Wise then asked her another question, raising his voice to ask it, and Plaintiff answered this question. As she continued to walk away, Mr. Wise then called out to Plaintiff "come here," and gestured with his index finger.  When Plaintiff turned around, she observed Mr. Wise looking at her below her waist, and believed that she had interrupted him in looking at her in a sexual manner as she was walking away. Plaintiff was offended by this behavior and told Mr. Wise that she would report his actions and Mr. Wise then falsely accused Plaintiff of insubordination.

36.     The hostility encountered by Plaintiff in response to her complaints of race, sex/gender, sexual harassment, the ensuing retaliation launched against her due to the filing of the EEO and other complaints, and the whistleblower retaliation she has experienced resulted in Plaintiff developing what her medical doctor described as "acute stress" and her therapist, described as "anxiety and depression with an adjustment disorder."

37.     On March 22, 2006, Plaintiff was approved sick leave and on March 28, 2006, her therapist recommended that she take time off of work.  In furtherance of this action, she provided an email to her management staff as well as provided the Acting Director of Human Resources, Ms. Caroline Heard.  On March 30, 2006 she also provided the appropriate medical documentation describing her illness.

38.     On April 6, 2006, Mr. Wise provided Plaintiff with a letter proposing to place Plaintiff in AWOL status if she did not supply additional medical documentation in support of her medical condition by April 19, 2006.  Plaintiff supplied the information as requested.  On April 20, 2006, Mr. Wise began sending Plaintiff numerous emails regarding the approval of both paid and unpaid leave.  When Plaintiff told Mr. Wise that she wanted to return to COP status to use the remainder of her COP, Mr. Wise told her that she could not because that claim was closed, and that she had exhausted her COP.  When Plaintiff informed Mr. Wise that she only used 12 days of COP and still had 33 days remaining, he contended that Plaintiff had no more COP time.

39.     Plaintiff was instructed by an OWCP representative that she would have to initiate another claim for the new incident.  Plaintiff complied and requested that she be permitted to use the balance of her COP from the previous claim.  OWCP never told Plaintiff that she could not use the balance of her COP benefits or the COP benefits from the new claim.  However, Mr.

1
2
3

Wise informed her that if she attempted to use COP and not elect annual leave in lieu of sick leave or leave without pay he would place her in AWOL status and threatened to controvert her COP benefits.

4
5
6
7
8
9
10
11
12

40.    On or about April 28, 2006, Mr. Wise sent Plaintiff emails regarding her leave status.  In one email communication, Mr. Wise told Plaintiff that he was granting her leave request and never denied Plaintiff leave, nor did he controvert Plaintiff's continued COP usage. Therefore, barring no denial by OWCP or Mr. Wise, she reasonably understood that her time was being carried in COP status.  However, on May 8, 2006, Mr. Wise informed Plaintiff via telephone that he changed the designation of her status to reflect that she was AWOL.  Plaintiff was retroactively placed in AWOL status effective April 2, 2006 but did not learn of this change until May 8, 2006.

13
14
15
16
17
18

41.    On or about May 15, 2006, Plaintiff's therapist assessed her and attributed Plaintiff's symptoms to the conflict with her supervisor.  The therapist determined that Plaintiff's "condition significantly and detrimentally impact[ed] her ability to perform her duties in her present work environment."  Accordingly, Plaintiff requested reasonable accommodations incompliance with agency's own reasonable accommodation policy but received no response to her request.

19
20
21
22
23
24
25

42.    In June 2006, Plaintiff again requested reasonable accommodations in compliance with the policy and still received no response.  Shortly thereafter, she received an email from Mr. Wise with the reasonable accommodation policy attached to it and a note telling her to comply with the policy when making her request although he was aware that Plaintiff had complied with the reasonable accommodation policy in her two prior requests for reasonable accommodation.

43.     After Plaintiff's third request for reasonable accommodations, she learned that her second line supervisor, Mr. Roderick Anderson, who was now handling her request, failed to provide truthful and accurate information to the EEOC and OWCP about the unsubstantiated threat matter from March 2006.  Plaintiff requested the police to return to conduct further investigations of the threat allegation but the police informed Plaintiff that the agency would not agree to continue the investigation.

44.     On July 2, 2006, Plaintiff filed a Federal Tort claim asserting that Mr. Anderson provided false information to the EEOC and OWCP, maliciously using the unsubstantiated threat allegation against her and to intentionally inflict her with emotional distress.

45.     On July 5, 2006, Mr. Anderson denied Plaintiff's reasonable accommodation request.  On July 9, 2006, Plaintiff asked Mr. Anderson to reconsider his denial of her reasonable accommodation request but he rejected her request..

46.     On July 14, 2006, Plaintiff  appealed the denial of her request for reasonable accommodations but the denial was upheld by the Deputy Special Counsel, Ms. Rebecca McGinley.  Plaintiff then asked Mr. Anderson what she should do about returning to work but he never replied.

47.     On July 22, 2006 while still on medical leave, Plaintiff informed Mr. Anderson of her intention to disclose to Congress the agency's breakdown and non-compliance with law, including the breakdown of the new Customer Service Unit and atmosphere of internal repression.

48.     Shortly thereafter, Mr. Anderson, with knowledge of the Plaintiff's various protected disclosures and her outstanding administrative claims, issued to Plaintiff via email a proposal to remove her from her position on the charge of being AWOL.

AMENDED COMPLAINT- 13

49.     Despite Plaintiff's request to return to work within medical restrictions and being denied a reasonable accommodation, she was continually and improperly held in AWOL status until her termination.

50.     On November 17, 2006, Plaintiff was terminated from her position for being in an AWOL status.

51.     Plaintiff subsequently learned that as a result of being taken from a paid leave status and retroactively placed in an AWOL status, she was alleged to owe the government for overpayment and non-payment of health benefits.

52.     Plaintiff filed informal and later formal complaints with the OSC EEO office regarding the race, sex/gender, sexual harassment, and disability discrimination set forth above, as well as EEO complaints that she was retroactively placed in AWOL status despite her medical condition, OWCP claims, and being granted paid and unpaid leave..

53.     As a result of the above referenced hostile work environment and termination from her employment with the resulting loss of income and livelihood, the Plaintiff has suffered emotional distress, humiliation, fear and anxiety, damage to her personal reputation, and diminished enjoyment of life.

54.     As a result of the termination from her employment and the inability to obtain replacement employment due to the adverse personnel actions taken and the emotional distress inflicted by the Defendant, Plaintiff has suffered a loss of income, wages and benefits, and injury to her career and professional reputation.

## VII.     CLAIMS FOR RELIEF

**CAUSE OF ACTION:  VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT**

55.     Plaintiff incorporates all of the foregoing allegations herein.

56.     The disclosures set forth above evidenced waste, gross mismanagement, abuse of authority, and violation of laws and regulations. Plaintiff's managers and the Defendant had knowledge of these disclosures.

57.     Consideration of Plaintiff's protected disclosures, filing of EEO complaints, MSPB appeals, OWCP claims, and Federal Tort claim was a contributing factor in the decision to remove her from her employment.

58.     The Agency's removal action cannot be sustained under 5 U.S.C.A. § 7701(c)(2)(B) because it was based on a prohibited personnel practice described in section 2302(b).

59.     The removal of Plaintiff violated 5 U.S.C.A. § 7513 because it was not taken to promote the efficiency of the service.

**SECOND CAUSE OF ACTION:  VIOLATIONS OF TITLE VII**

60.     Plaintiff incorporates all of the foregoing allegations herein.

**COUNT 1:  DISCRIMINATION BASED ON RACE AND SEX**

61.     Plaintiff specifically alleges that (a) she is an African-American woman and is a member of a class protected by Title VII; (b) she was qualified for the position she held and performing her job in a satisfactory manner; (c) she was terminated from that position under circumstances giving rise to an inference of discrimination.

62.     Plaintiff suffered the above referenced hostile work environment, termination from her employment, emotional distress and economic damages in retaliation for her complaints

and protected disclosures and because she is Black and a woman, and the Defendant's adverse

and disadvantageous actions were taken against her in violation of Title VII of the Civil Rights

Act ("Title VII"), 42 U.S.C. § 2000e-2(a)(1).

### COUNT 2.  RETALIATION FOR OPPOSING DISCRIMINATION

63.    Plaintiff (1) engaged in a protected activity by opposing what she reasonably

believed to be discrimination based on race, sex/gender, sexual harassment, which is an unlawful

employment practice under Title VII; (2) suffered the adverse employment decisions set forth

above, including a hostile work environment, taken from a paid leave status and retroactively

placed in an AWOL status, denial of a transfer, and removal; and (3) there was a causal link

between her protected activity and the termination. The Defendant retaliated against the Plaintiff

for opposing and complaining about sex/gender, sexual harassment, and race discrimination in

violation of the anti-retaliation provisions of

Title VII, 42 U.S.C. § 2000e-3(a).

### THIRD CAUSE OF ACTION:  VIOLATIONS OF REHABILITATION ACT OF 1973, 29 U.S.C. § 791

64.    Plaintiff incorporates all of the foregoing allegations herein.

### COUNT 1:  DISCRIMINATION BASED DISABILITY

65.    Plaintiff specifically alleges that (a) she suffered from a qualifying disability of

severe anxiety and depression that interfered with a major life activity; (b) she presented to the

Agency sufficient documentation of said disorder and requested reasonable accommodations; (c)

with the requested accommodations, she was qualified for the position she held and could

perform her job in a satisfactory manner; (d) she was denied reasonable accommodation, and

was removed on the pretextural ground of being in an AWOL status; and (e) Plaintiff was

1
2
terminated from her position under circumstances giving rise to an inference of disability

discrimination..

3
4
66.     Defendant's adverse and disadvantageous actions against her because of her

disability were therefore in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et. seq*

5
6
**COUNT 2.  RETALIATION FOR OPPOSING DISABILITY DISCRIMINATION**

7
8
9
10
67.     Plaintiff (1) was engaged in a protected activity by opposing what she reasonably

believed to be disability discrimination, an unlawful employment practice under the

Rehabilitation Act; (2) suffered the adverse employment decision of termination; and (3) there

was a causal link between her protected activity and the termination.

11
12
13
68.     The Defendant retaliated against the Plaintiff for opposing and complaining about

disability discrimination in violation of the Rehabilitation Act.

14
15
**VIII.     RELIEF REQUESTED.**

16
69.     Based on the foregoing, Plaintiff requests the following relief:

17
18
19
20
21
22
A.  Under all claims for relief, the Plaintiff should be reinstated to her former position

with back pay, retirement contributions, pay raises and cost of living increases, seniority

privileges, and all other benefits, together with the monetary value of all lost benefits, including

the value of lost retirement benefits and health insurance; and upon such reinstatement, the court

should enjoin the Defendant from engaging in such unlawful employment practices, and order

such other affirmative action as may be appropriate;

23
24
25
B.  Under all claims for relief, if Plaintiff is not reinstated, then Plaintiff should be

awarded back pay or wages lost and benefits, and for such legal or equitable relief as may be

appropriate;

AMENDED COMPLAINT- 17

C.   Under all claims, if Plaintiff is not reinstated, then Plaintiff should be awarded monetary damages for front pay and benefits, including retirement benefits and health insurance, reduced to present value, for a term of years to be determined at trial;

D.   Under all claims, Plaintiff should be awarded compensatory damages of not less than $300,000, the exact amount to be determined at trial;

E.   Under all claims, Plaintiff should be awarded interest on back pay and lost wages, and such other equitable and affirmative relief as may be appropriate; and

Plaintiff should be awarded her reasonable attorney's fees and litigation expenses, including expert fees, be paid by the Defendant pursuant to 42 U.S.C. § 2000e-5(k), and 5 U.S.C.A. § 7701(g)(2).

Respectfully submitted,

/s/ Richard E. Condit
_____
Richard E. Condit (D.C. Bar No. 417786)
Senior Counsel
Government Accountability Project
1612 K St NW, Suite 1100
Washington, DC 20006
Tel (202) 457-0034
Fax (202) 457-0059
E-mail richardc@whistleblower.org

Counsel for Plaintiff

AMENDED COMPLAINT- 18